Filed 11/4/24  P. v. Jones CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

| California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115. |
|---|

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B330317 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA067451) |
| v. | |
| MARQUISE JONES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Michael E. Pastor, Judge.  Affirmed.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Marquise Jones, also known as Marcus Parks, appeals from the denial of his petition for resentencing pursuant to Penal Code section 1172.6 (former § 1170.95).  At the evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), the court found substantial evidence supported a finding that defendant was the actual killer and a major participant in the underlying robbery who acted with reckless disregard.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    The Charges

In September 2002, defendant was an accomplice in the robbery of a jewelry store with six other accomplices:  Arnold Wayne Lynch (Lynch), his sister Arnetta Lynch (Arnetta), Karl Smith (Smith), William Cooper (Cooper), Nathaniel White (White) and Shareka Smith (Shareka).  Defendant fatally shot the jewelry store owner during the robbery.

Defendant was charged with murder (Pen. Code, § 187, subd. (a); count 1), conspiracy to commit robbery (§ 182, subd. (a)(1), § 211; count 2), robbery (§ 211; count 3), and commercial burglary (§ 459; count 4).  As to count 1, robbery-murder and burglary-murder special circumstance allegations were alleged (§ 190.2, subd. (a)(17)).  As to counts 1, 2 and 3, it was alleged defendant personally used and discharged a firearm causing great bodily injury (§ 12022.53, subds. (b)-(d)).  As to all counts, it was alleged a principal was armed with a firearm (§ 12022, subd. (a)(1)).  It was also alleged defendant had suffered two prior convictions for violent or serious felonies within the meaning of the "Three Strikes" law (§ 1170.12, subds. (a)-(d), 667, subd. (b)).

2

## 2. The 2005 Jury Trial

Defendant was tried with codefendant Lynch in September 2005 before Judge Michael E. Pastor. Codefendants Smith and Cooper were tried together in a separate trial. Codefendants Shareka, Arnetta, and White entered into plea agreements pursuant to which each of them agreed to testify truthfully against their cohorts.

The following facts, germane to our discussion, were adduced at defendant's 2005 trial.

Defendant and his accomplices were longtime friends who often hung out at an apartment complex where Lynch's mother and sister Arnetta lived. On September 12, 2002, they discussed committing a robbery at the jewelry store located inside the nearby Avalon Discount Mart (Mart). The Mart housed a variety of different vendors and shops similar to a swap meet, including a jewelry store owned by victim Jin Kim and his wife. The Mart normally had three armed security guards on duty during business hours.

### a. Accomplice testimony

Shareka testified it was Lynch who came up with the robbery plan. Lynch, Cooper and Shareka were hanging out at the apartment complex that morning when Lynch mentioned his idea and asked Shareka to stage a fight at the Mart. Lynch said they needed to cause a distraction for the security guards so that the rest of the group would have an opportunity to "hit" the jewelry store. Shareka agreed. The three of them then walked around the apartment complex looking to recruit some more friends to assist in the robbery. Smith, White, Arnetta, and defendant agreed to participate. At least two other friends, including Frank Norwood, said no.

Throughout the morning, the group continued to discuss Lynch's plan for the robbery which they planned to do that afternoon during normal business hours when the Mart was open to the public. Shareka and Arnetta would engage in a staged fight so that Smith, Cooper and defendant could "do their thug thizzle" and rob the jewelry store. White agreed to drive Shareka to the Mart, wait for her and drive her back after the robbery. After completing the robbery, Lynch was going to sell the stolen jewelry and split the money with the others.

After arriving at the Mart and walking around for a few minutes, Shareka saw Arnetta, and they called each other names and started to fight as planned. At least two of the Mart's security guards came over and attempted to intervene. Shareka then heard a gunshot which scared her, so she took off running. She saw White in his car, got in and yelled at him to go. They tried to leave but a security guard closed the parking lot gates. Shareka jumped out of the car, slipped through a break in the fence and ran back to the apartment complex by herself.

Sometime later that day, Shareka saw Lynch, Smith, Cooper and defendant back at the apartment complex. They were sitting in a car, talking and listening to music and she stopped to talk. Both Smith and Cooper had bandages on their hands which they did not have earlier. Shareka said she heard a gunshot at the Mart and asked them what happened. Lynch said, "nothing."

Shareka testified that when she was first arrested, she lied to the police. She was scared because she heard that someone died during the robbery. When she was told that others were implicating her in staging the fight, she truthfully told the police what happened. Shareka also said she initially told the police defendant was not involved because she liked him and wanted to

4

protect him. But she said she was being honest when she testified that defendant had agreed to participate.

Arnetta testified her brother (Lynch) told her she could make $1,000 if she agreed to stage a fight with Shareka at the Mart. She was not sure what the others' roles were going to be once they got to the Mart but she knew they were going there to "get" stuff. Once she got to the Mart, Arnetta saw defendant. She then ran into Shareka, and they engaged in their pretend fight for several minutes. Two security guards and a male store employee tried to stop it. Arnetta then heard glass shattering, followed soon after by a gunshot. She got scared and ran home

Later that evening, her brother (Lynch) and Smith were at her mother's house with a lot of jewelry. Arnetta asked if she could have some and her brother said no—that she would get her cut after he sold the jewelry. He eventually gave Arnetta $100 and some jewelry. He also asked Arnetta to hold onto a handgun for him. She put the gun in a shoe box in her closet and about a week later, Smith came to the house and retrieved it.

White testified to most of the same facts as Shareka and Arnetta, but he denied ever agreeing to participate in the robbery. White said he was just hanging out with the others while they discussed Lynch's plan for robbing the jewelry store, but he did not agree to participate. At first he thought they were joking, but then he realized they were actually going to commit the robbery. White said he agreed to plea after he was arrested because of the false statements made against him. White said Smith, Cooper, Shareka, Arnetta and defendant did agree to participate in the robbery but maintained that he had not. White confirmed that Frank Norwood, another one of their friends, was also not involved in the robbery and was not at the Mart that day.

5

White said that before the group headed to the Mart that afternoon, Lynch explained to everyone where he believed the security cameras were located and that there were none by the jewelry store. He said the security guards were "scary" but he did not believe they would have any trouble with them. Defendant agreed with Lynch on that point. Shareka and White were both aware the security guards were armed. Smith and Cooper volunteered to smash the display cases once they got inside and Lynch said okay. Lynch would act as the getaway driver.

The group also discussed creating a diversion. Defendant, who was dressed in blue, suggested they fake a gang fight. (At least one of the others was wearing red clothes or a red cap.) Lynch initially said that was a good idea, but eventually decided it was better for the staged fight to be between Shareka and another female. Lynch got his sister Arnetta to agree to participate. While Lynch was talking with his sister, Cooper, Smith and defendant remained outside "revving each other up" for the robbery.

White said he followed Lynch's car to the Mart because he was "nosy" and wanted to see the others pull off the robbery. When White got inside the Mart, he saw Smith, Cooper and defendant standing "directly across" from the jewelry store "conferring with each other." White heard a "commotion" in the Mart, and saw Cooper and Smith, who was holding a tire iron, standing at the glass display cases in the jewelry store. He could not see defendant at this point because his view of the inside of the store was partially blocked. He heard glass shattering and then the sound of a gunshot. He ducked down. Smith, Cooper and defendant ran past him, heading for the exit. He did not see any of them holding a gun.

White ran to his car to go home. Shareka, who was "hysterical," ran up and yelled at him to get her out of there. She jumped into his car, but he could not leave because the parking lot gates were closed. Shareka got out and ran off. White stayed at the Mart and spoke to the police officers who arrived on the scene. He initially did not tell them he knew anything about what happened. He only said he saw "three male Blacks" and did not volunteer any other information.

White ran into Smith and Cooper later that day and they were "excited," had "rings on each finger, necklaces" and their hands were bandaged. They both admitted to him they cut their hands on the broken glass of the display cases. The next day, White ran into the rest of the group (except for Arnetta) at the apartment complex. Lynch said he was going to take the jewelry to his "connection downtown and exchange it."

A few days after that, White encountered defendant and Smith having a conversation. Defendant was repeatedly telling Smith that he needed to get rid of the gun so they did not get caught with it. Smith kept saying he would not get rid of it because it was the only gun he had. White said defendant was mad. White told defendant he should find a way to get the gun and get rid of it himself. White asked defendant what happened, and defendant said "it was an accident." Mr. Kim had "lunged" at him. Defendant did not mean to pull the trigger—he only meant to scare Mr. Kim. White reiterated that defendant needed to find a way to get rid of the gun.

### b.    Other evidence

Photographs and video from security cameras at the Mart showed Arnetta, White, Shareka and defendant inside the Mart, in the vicinity of the jewelry store.

Juan Barragan, an employee at a clothing store in the Mart, was on duty that day and heard a fight break out. Mr. Barragan said he saw two women fighting and tried to intervene, but backed off after the security guards arrived. He saw a man standing in front of the jewelry store. At some point, he heard the sound of glass shattering and saw a man in a red cap reaching inside a broken display case in the jewelry store. He then heard a gunshot and ducked down because he was scared.

Daniel Austin testified he was home on the afternoon of September 12, 2002, and Frank Norwood, who lived in a motor home on his property, was there as well. A man came over to visit Frank that day, and Mr. Austin bought two rings from him. The man had a cut on his hand that was bleeding and Mr. Austin's girlfriend bandaged it for him. Mr. Austin could not recall telling the police that two men came to the house that day and that both men had cuts on their hands.

DNA testing established that blood matching Smith's DNA profile was found on one of the display cases and on the ground in front of it. Smith's fingerprint was also found at the scene, along with a crowbar.

After arrests were made in the case, the police used recording devices that captured several jailhouse conversations between defendant and some of his accomplices. One conversation between defendant, Lynch and Smith included Smith saying the police already knew every "single thing that went down." Both defendant and Smith said they were going to

deny knowing anything. One portion of another conversation captured defendant, Lynch and Cooper discussing the victim's injuries. Lynch said the victim was shot "in the arm [and] in the chest." Defendant said, "[r]ight arm." Cooper said it went "through his aortic valve." Defendant said, "that bleez out" and Cooper responded by laughing. A second conversation between defendant, Lynch and Cooper contained significant amounts of slang that appeared to reference a gun. Defendant said they needed somebody "to throw him in the ocean." Lynch said he did not tell "this idiot" to "throw it in the ocean," he had told him to "destroy it."

## 3. The Verdict, Sentencing and Direct Appeal.

The jury found defendant guilty of first degree murder (count 1) and found true both special circumstance allegations. Defendant was also found guilty of conspiracy to commit robbery (count 2), robbery (count 3), and second degree burglary (count 4). As to all four counts, the jury found true the allegation that a principal was armed with a firearm within the meaning of Penal Code section 12022, subdivision (a)(1). The jury was unable to reach a verdict as to the personal firearm use allegation pursuant to section 12022.53. We reserve a more detailed discussion of the jury's deadlock on the personal use allegation to part 1 of the Discussion below.

In a bifurcated proceeding, the court found true that defendant had suffered two prior felony convictions for serious or violent felonies within the meaning of the Three Strikes law. Defendant was sentenced to life without the possibility of parole on count 1, plus a consecutive 25 years to life term on each of counts 2 and 3. The court stayed sentence on count 4 and awarded defendant 1,185 actual days of presentence custody

9

credits.  The court, on its own motion, struck the principal firearm use enhancement.

In 2007, we affirmed defendant's conviction in its entirety in an unpublished decision.  (*People v. Lynch* (Mar. 29, 2007, B188576) [nonpub. opn.].)

**4.      Resentencing Proceedings**

After the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.), defendant filed, in propria persona, a form petition for resentencing pursuant to section 1172.6.  The court denied the petition on the merits without first appointing defense counsel.  The People do not contest defendant's entitlement to refile his petition and obtain counsel to assist him in arguing his eligibility for sentencing relief.  (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

In February 2021, defendant filed this second form petition declaring that he had been charged and convicted of murder under the felony murder rule or natural and probable consequences doctrine.  Defendant requested the appointment of counsel.  In a typed one-page attachment to the petition, signed under penalty of perjury, defendant said he was not convicted as the actual killer but conceded that "I was an AIDER AND ABETTOR to the crime."

Defendant's second petition was assigned to Judge Pastor, who had presided over defendant's 2005 jury trial.  The court appointed defense counsel, and the parties filed briefs.  The People conceded defendant made a prima facie showing, the court agreed and set a hearing date.

**a.      The evidentiary hearing**

The hearing took place on April 12, 2023.  Defendant appeared via Webex, having waived his right to appear in person.

10

The prosecutor, Danette Meyers, was the same prosecutor that tried the case in 2005.

At the start of the hearing, the court said it had reviewed defendant's petition, the parties' briefing, and the record of conviction. The court said, "I have a very clear recollection of this case, although it obviously is, at this point in time, decades old. And I have thoroughly reviewed the materials," including the reporter's transcript of the trial. The court took judicial notice of the trial transcripts and evidence. Neither side presented new evidence. The court recited that the People had the burden of proof beyond a reasonable doubt to establish defendant's ineligibility for sentencing relief.

The prosecutor said the theory of the case was the same as it was in 2005, namely that defendant was the only member of the conspiracy with a gun, and he was the actual shooter. She said, "I know that the jury came back 10 to 2 on the allegation of personal use of a firearm," but the evidence showed "overwhelmingly" that defendant was the shooter. She pointed to White's testimony that defendant had admitted to shooting Mr. Kim, as well as the corroborating circumstantial evidence about how the robbery was executed, including that Smith and Cooper were identified as the ones breaking the display cases and taking jewelry, with defendant standing nearby—the only other member of the conspiracy inside the jewelry store. The prosecutor said defendant was ineligible for relief because the evidence supported the finding that he was the actual shooter and a major participant who acted with reckless disregard under the factors articulated in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

Defense counsel emphasized that the jury deadlocked on the personal firearm use allegation and argued there was

insufficient, credible evidence defendant was the shooter, only the testimony of an accomplice who lacked credibility. He also argued the jury most likely convicted defendant of murder under the felony murder doctrine, but because of changes in the law, including as articulated in *Banks* and *Clark*, defendant could not now be found to be a major participant who acted with reckless disregard. Defense counsel described defendant's role as minor and asserted a lack of corroborating evidence regarding defendant having any role in the robbery plan, let alone the shooting.

### b. The trial court's ruling

The court denied the petition, finding beyond a reasonable doubt there was substantial evidence defendant was the actual shooter and a major participant in the robbery who acted with reckless disregard.

The court explained that under the statutory scheme, its role was to act as an independent factfinder and assess the evidence anew under the current law. The court thoroughly explained the bases for its ruling, saying that defendant "joined in an active defined conspiracy to hit the jewelry mart." Defendant was "directly" involved in executing the plan and did not play a peripheral role, like a getaway driver. Defendant made suggestions about how to divert the attention of the security guards and "was not simply a [casual] observer of something that was a surprise or unanticipated. He participated in discussions with others, a good number of others, and he joined with them on the actual premises." That defendant was there and participated in the robbery was "clearly established by testimony of witnesses as well as the evidence presented by way of photos."

12

The court emphasized the degree of danger associated with the agreed-upon plan to go to a crowded swap meet during business hours knowing there were armed security guards on site and members of the public who would be in harm's way. Defendant was aware his accomplices were going to use crowbars to smash the glass display cases and entered the store with them, "armed with an operable firearm." He stood by while Cooper and Smith smashed the display cases and collected the jewelry. That defendant brought and fired the weapon was "established by the circumstantial evidence in [the] case as well as admissions" defendant made to White that he shot the victim because he "lunged" at him. The court also noted White's testimony that defendant said he wanted the gun to be disposed of after the shooting.

The court acknowledged the jury "deadlocked on the issue of the personal use of a firearm allegation." But the court said it was "not bound by the fact that the jury did not unanimously agree to that fact. The court makes up its own mind as a separate factfinder." The court said it believed the evidence was "overwhelming that [defendant] alone pulled the trigger and was in fact the actual killer of Mr. Kim." The court said it found White's testimony about defendant's admissions of bringing and shooting the gun to be credible based on its own observations during trial and the circumstantial corroborating evidence.

The court said defendant also "did nothing to aid" the victim. "The tape recording of [defendant's] statements" with his accomplices revealed a "cavalier" and "almost flippant attitude" about the victim's death. The court said the evidence of defendant's actions before, during and after the robbery and the shooting "overwhelmingly" established his guilt as the "actual

13

killer" and as a major participant who acted with reckless indifference.

This appeal followed. We grant defendant's request to take judicial notice of the record of conviction, including the transcripts from the 2005 jury trial and our 2007 appellate opinion from defendant's direct appeal (*People v. Lynch, supra* B188576).

## DISCUSSION

1. **The Jury Deadlocked on the Personal Firearm Use Allegation. There Was No Stipulated Not True Finding.**

At the 2005 trial, before the formal taking of the verdicts, the court said it noticed there were blanks on the verdict forms with respect to the personal firearm use enhancements. The court asked the foreperson, "does that mean that the jury has not been able to reach [a] verdict as to those allegations, or is that just an error?" The foreperson responded by confirming the jurors "were not able to reach [a] unanimous verdict" as to those allegations. The court asked if they were "deadlocked" and the foreperson said, "[c]orrect."

At a sidebar conference, the following colloquy between the court and counsel occurred:

"THE COURT: It appears as to the use allegations [as] to [defendant] that the jury is deadlocked. Do you wish me to inquire and go through the process? I mean you are entitled to, Ms. Meyers. I don't know what may or may not happen, but that is up to you. Otherwise, it would be jeopardy.

"[THE PROSECUTOR]: Your Honor, you don't have to inquire. I mean we can, if you want to. It doesn't matter to me whatever happens. We are not retrying it on the use allegation. I can tell you it is not happening, no matter what happens. [¶] I

14

see what you are saying. Well, no. We are not going to retry him on the use allegation.

"THE COURT: The People stipulate the court need not go through the process of finding out about the deadlock. Just basically, it would be a not true finding then.

"[THE PROSECUTOR]: That is fine. [¶] . . . [¶]

"[DEFENSE COUNSEL]: I will accept the stipulation. Thank you."

Later, at the sentencing hearing, defense counsel asked to clarify for the record that the jury "was not able to find" that defendant personally used a firearm. "I don't know that it ever got put on the record. That [it] was dismissed." The prosecutor responded, "It did get put on the record. I think we approached the bench, and the court asked me if we would proceed and I said, 'no.'"

The court said it was "a [Penal Code section] 1385 issue" and the prosecutor responded, "That's correct." The court elaborated: "Ms. Meyers said she didn't want the jurors polled. Jeopardy would attach. It would never be resurrected. It wasn't then. There is now a 1385 motion to dismiss because of the convictions and the sentences here." The prosecutor agreed that was a correct statement of what had occurred. The court then granted the oral defense motion to dismiss the personal firearm use allegation. There was no further discussion regarding the stipulation.

Defendant argues we should interpret the sidebar discussion between the court and counsel as a binding stipulation that defendant was not the shooter. The contention is without merit.

The court's discussion with the parties, and the resulting stipulation, reflects the parties' understanding of the well-settled

15

principles pertaining to double jeopardy. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) Double jeopardy "bars a second prosecution for the same crime after an acquittal or conviction." (*People v. Aranda* (2019) 6 Cal.5th 1077, 1083.) Double jeopardy does not attach where a court makes a finding the jury is deadlocked and a mistrial is declared. (*Ibid.*) But, the granting of " 'an *unnecessary* mistrial bars retrial' under double jeopardy principles." (*Ibid.*, italics added.) Before granting a mistrial, the court must determine the legal necessity for it, or jeopardy will attach akin to an acquittal. (*Ibid.*)

Here, the court asked the prosecutor if she wanted the jury polled—the first step in assessing whether the jury was truly deadlocked. The prosecutor said she did not ask the court to poll the jury because the prosecution would not retry defendant on the personal firearm use allegation under any circumstances. The conversation demonstrates the parties understood that without going through the procedure for establishing the legal necessity for a mistrial, double jeopardy would attach to the personal use allegation, precluding a retrial. The prosecutor agreed to forego that inquiry and acknowledged that double jeopardy would attach to the personal use allegation. Defense counsel also agreed, and the court so found.

That the court and parties understood and intended their conversation about the personal use allegation to be about the attachment of jeopardy was underscored by their subsequent discussion at the sentencing hearing. Defense counsel asked if the dismissal of the personal use allegation was on the record. The prosecutor said, "It did get put on the record. I think we approached the bench, and the court asked me if we would proceed and I said, 'no.' " The court agreed with the prosecutor's recollection and elaborated by saying "Ms. Meyers said she didn't

16

want the jurors polled.  Jeopardy would attach.  It would never be resurrected.  It wasn't then.  There is now a 1385 motion to dismiss because of the convictions and the sentences here."  The prosecutor agreed and the court dismissed the allegation at that time.

Defendant has received the full benefit of the stipulation actually agreed to by the parties.  The personal use allegation was dismissed and defendant was not retried on personal firearm use.  The jury did *not* return a not true finding on personal firearm use, and the resentencing hearing was not a second prosecution.  The court was therefore allowed to consider evidence of defendant's gun use as it related to the substantive offense of murder.  (*People v. Santamaria* (1994) 8 Cal.4th 903, 922-926; see also *People v. Wilson* (2023) 90 Cal.App.5th 903, 916-917.)

**2.  Defendant's Issue Preclusion and Implied Acquittal Arguments Have Been Forfeited.**

Defendant failed to make any arguments at the evidentiary hearing invoking the doctrines of issue preclusion or implied acquittal.  He therefore is precluded from raising them for the first time in this appeal.  (See *People v. Duran* (2022) 84 Cal.App.5th 920, 928 [failure to object to evidence at evidentiary hearing pursuant to Pen. Code, § 1172.6 forfeits claim of evidentiary error on appeal]; *People v. Schell* (2022) 84 Cal.App.5th 437, 444 [argument not raised at evidentiary hearing pursuant to § 1172.6 is forfeited]; *People v. Harden* (2022) 81 Cal.App.5th 45, 52 [failure to raise collateral estoppel or issue preclusion in the trial court forfeits contention on appeal]; see also 9 Witkin, Cal. Procedure (6th ed. 2021 & 2024 suppl.) Appeal, § 420.)

Even if we were inclined to consider these arguments on the merits, we would reject them.

Defendant's issue preclusion argument is based on the erroneous assertion there was a stipulation for a not true finding on the personal firearm use allegation—an assertion that is without merit as explained above. Because we do not reach the merits of defendant's issue preclusion argument, we need not discuss *People v. Arnold* (2023) 93 Cal.App.5th 376, *People v. Henley* (2022) 85 Cal.App.5th 1003 and *People v. Cooper* (2022) 77 Cal.App.5th 393, all of which involved not true findings and acquittals. Defendant's implied acquittal argument is not supported by any authority applying the doctrine to sentence enhancement allegations.

3. **Defendant's Prosecutorial Error and Ineffective Assistance Arguments Lack Merit.**

Defendant says the prosecutor committed misconduct by failing to disclose to the court she had stipulated to a not true finding on defendant's personal firearm use at the 2005 trial and was therefore precluded from arguing defendant was the shooter in opposing defendant's petition. Defendant also contends his appointed counsel was ineffective for failing to argue the significance of the so-called stipulated not true finding. Both contentions are manifestly without merit.

a. **Prosecutorial error**

Defendant forfeited this argument by failing to raise it below. (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1164 [making a timely and specific objection in trial court " 'is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal' "].) In any event, as we said above, it is manifestly without merit.

18

There was no stipulated not true finding for the prosecutor to disclose to the court. The prosecutor began her argument at the evidentiary hearing acknowledging the jury's deadlock on the personal use allegation. Judge Pastor was the judge who took the jury's verdicts and engaged in the discussion with counsel about the jury's inability to reach a verdict on the personal use allegation. Judge Pastor informed the parties he had a "very clear recollection of this case." There was no misconduct.

### b. Ineffective assistance

Defendant has also not shown the required elements of an ineffective assistance claim. (*People v. Johnson* (2016) 62 Cal.4th 600, 653 [to establish ineffective assistance claim, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that he suffered prejudice]; *Strickland v. Washington* (1984) 466 U.S. 668, 688, 693–696.)

Like the prosecutor, defense counsel expressly pointed out the jury's deadlock on the personal use allegation to the court. He emphasized the jury's deadlock as part of his overall argument that the evidentiary record lacked credible evidence defendant was the shooter or was a major participant who acted with reckless disregard. Defense counsel did not argue issue preclusion or implied acquittal at the evidentiary hearing, but manifestly those principles did not apply, and he had no duty to advance legally and factually unsupportable arguments. (*People v. Anderson* (2001) 25 Cal.4th 543, 587; *People v. Brannon-Thompson* (2024) 104 Cal.App.5th 455, 465.)

19

4. **Substantial Evidence Supports the Findings that Defendant was the Actual Killer and a Major Participant in the Robbery Who Acted With Reckless Indifference.**

a. **Law of the case**

The People assert the doctrine of law of the case forecloses reconsideration of the question whether substantial evidence supports the factual finding that defendant was the actual killer because this court already so found in affirming defendant's conviction in his 2007 direct appeal (*People v. Lynch, supra* B188576.)

The law of the case doctrine " ' "generally precludes multiple appellate review of the same issue in a single case." ' " (*People v. Gray* (2005) 37 Cal.4th 168, 196.)  But it will not be adhered to where, as here, "the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations."  (*People v. Stanley* (1995) 10 Cal.4th 764, 787.)

Since the affirmance of defendant's conviction in 2007, Penal Code sections 188 and 189 were amended, section 1172.6 was enacted, and the Supreme Court issued its decisions in *Banks* and *Clark*, all of which altered and clarified murder liability in California.  We therefore decline to apply the law of the case doctrine.

b. **Substantial Evidence Supports Denial of Defendant's Petition.**

We review the trial court's denial of defendant's petition under the substantial evidence test.  (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480 (*Oliver*) [resolving whether a defendant was the actual killer or a major participant in an underlying felony are predominantly factual questions reviewable for

20

substantial evidence]; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591 [proper standard of review is substantial evidence and reviewing court "defers" to trial court's factual findings].)

We have reviewed the evidentiary record considered by the trial court and conclude that substantial evidence supports the denial of defendant's petition.

The substantial evidence supporting defendant's guilt is the testimony of three accomplices (Shareka, Arnetta and White) and defendant's admission that he shot Mr. Kim during the robbery. Accomplice testimony is inadmissible unless supported by corroborating evidence. (Pen. Code, § 1111.) But, the law "requires only slight corroboration, and the evidence need not corroborate the [accomplice] testimony in every particular." (*People v. Gurule* (2002) 28 Cal.4th 557, 628.) Corroborating evidence is sufficient even if it is entitled to little consideration on its own, so long as it tends to connect the defendant to the crime and relates to some act or fact that is an element of the crime. (*People v. Williams* (1997) 16 Cal.4th 635, 680-681.) As reflected in the evidence summarized above, there was ample corroboration of defendant's guilt, not the least of which were the security photographs showing defendant at the Mart that day and the recordings of his conversations with his accomplices.

### c. Defendant's age as a relevant factor in the analysis.

Defendant contends the court erred in failing to consider his age (23) at the time of the crimes in 2002 in assessing whether there was sufficient evidence he was a major participant in the robbery who acted with reckless disregard.

Several recent appellate decisions have concluded that "a defendant's youth—defined, roughly, as being 25 years of age and

21

younger—is a factor within the totality of circumstances relevant to the requisite mental state for felony murder." (See, e.g., *People v. Pittman* (2023) 96 Cal.App.5th 400, 416 [and cases cited therein]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1081; *People v. Harris* (2021) 60 Cal.App.5th 939, 960.)

Several of the cases were published before the evidentiary hearing in this case in April 2023. We presume the court was aware of the relevant law, unless the record shows otherwise. However, assuming for the sake of argument that it was error for the court to fail to expressly state that it had considered defendant's age as a factor in its analysis of his guilt, any such error was harmless.

Where, as here, an error is purely one of state law, we apply the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Epps* (2001) 25 Cal.4th 19, 29; accord, *Lewis*, *supra*, 11 Cal.5th at pp. 973-974 [failure of court to appoint counsel at prima facie stage of Pen. Code, § 1172.6 petition is judged under *Watson* standard for state law error]; *People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1239 [applying *Watson* test in context of § 1172.6 proceeding]; *Oliver*, *supra*, 90 Cal.App.5th at p. 489, fn. 8 [same]; *People v. Myles* (2021) 69 Cal.App.5th 688, 706 [same].) Defendant must demonstrate there is a reasonable probability that in the absence of the error, he would have obtained a more favorable result. (*Watson*, at p. 836.) Defendant has not done so.

Defendant was a 23-year-old adult at the time of the crimes in September 2002. We agree with *Oliver* that "[p]resumably, the presumption of immaturity weakens as a defendant approaches 26." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489.)

Moreover, as the trial court aptly noted, the evidence demonstrated that defendant was not a passive observer who was

22

pressured to participate in the robbery by his accomplices, all of whom were longtime friends. Rather, defendant was an active participant, offering up suggestions on how best to distract the security guards, agreeing to be one of the three accomplices to go into the jewelry store and commit the robbery, taking a loaded handgun into the store, and arguing for disposal of the gun after the crimes were committed. There was also evidence that other individuals were asked to participate and said no, and they were not pressured or coerced by the others. Nothing in the record suggests defendant's participation was the result of immaturity, impetuosity or a youthful failure to appreciate the risks and consequences of the criminal conspiracy. (*In re Moore* (2021) 68 Cal.App.5th 434, 454 [" 'hallmark features' " of youth include " 'immaturity, impetuosity, and failure to appreciate risks and consequences' "].)

## DISPOSITION

The order denying defendant and appellant Marquise Jones's petition for resentencing pursuant to Penal Code section 1172.6 is affirmed.

GRIMES, J.

WE CONCUR:

STRATTON, P. J.

WILEY, J.

23